Theresa Caruso, Defendant in Error, v. City of Chicago, Plaintiff in Error.

Gen. No. 37,320.

Opinion filed December 31, 1934.

WILLIAM H. SEXTON, Corporation Counsel, and A. M. SMIETANKA, City Attorney, for plaintiff in error; QUIN

O'Brien, Joseph F. Grossman and Casper Nathan, Assistant Corporation Counsel, of counsel.

Wetten, Pegler & Dale, of Chicago, for defendant in error.

Mr. Presiding Justice Gridley delivered the opinion of the court.

By this writ of error defendant, City of Chicago, seeks to reverse a judgment of $6,000, rendered against it after verdict on February 10, 1933, in an action for damages for personal injuries suffered by plaintiff and occasioned by her stumbling against and falling upon a certain water pipe or water shut-off box, maintained by defendant in a parkway between the curb and sidewalk on the south side of Washington boulevard and west of Laramie street in Chicago. The accident happened on January 11, 1930, about 8:30 o'clock, p. m., after dark and when snow was on the ground and plaintiff and others were about to board an eastbound bus of a certain Motor Coach Co. The action was commenced on January 10, 1931, and the trial was had and verdict returned during December, 1932.

Plaintiff's original declaration consisted of two counts, to which defendant filed a plea of the general issue and a further plea stating that at the time of the accident defendant "did not own, possess, control or have custody of the instrumentality that caused the injury, nor the place of the accident." In the first count it is averred in substance that on and prior to January 11, 1930, defendant, a municipal corporation, "owned, controlled, managed and operated" Washington boulevard, a public highway, at or near Laramie street, in the City of Chicago, and also controlled and operated the sidewalks thereon; that there was on the southwest corner of the two streets "a city water pipe

then and there projecting above the ground adjacent to the sidewalk of Washington boulevard and near Laramie street''; that defendant ''knowingly and negligently suffered and permitted the water pipe to project above the ground without any protection, sign or warning''; that on January 11, 1930, while plaintiff, in the exercise of ordinary care and caution for her own safety, ''was proceeding from said sidewalk to the street for the purpose of boarding a public conveyance, she then and there stumbled against the water pipe, . . . was thrown down and seriously injured her knee and other parts of her body''; and that as a result she suffered great pain, became sick and permanently disordered, was hindered in transacting her business and affairs, and was obliged to and did expend large sums of money in her endeavor to be healed of her wounds, sickness and disorder. It is further averred that on July 8, 1930, plaintiff caused to be served upon defendant, its corporation counsel, its city attorney and its city clerk ''a notice in words and figures as follows:'' (The notice is set forth in full, bearing the signature of plaintiff, by her attorney, and the signatures, by stamp or handwriting of said three officials of defendant, and as having been received by each of them on July 8, 1930.) In the body of the notice is the following:

''On January 11, 1930, at or about 8:30 o'clock, p. m., at the southwest corner of Washington Boulevard and Laramie street in the city of Chicago, . . . Theresa Caruso, 28 years of age, of 840 North Laramie street, Chicago, Illinois, proceeding toward an east-bound motor bus, which had stopped to enable her and others waiting there to board it, stumbled against a city water pipe, then and there projecting above the ground adjacent to the sidewalk, and was thrown down, seriously injuring her knee, the said injuries having been attended to by Dr. Salvatore F. Mirabella, 501 North Halsted street, Chicago, Illinois.

"This notice is given in compliance with an Act of the Legislature of Illinois, concerning suits at law for personal injuries, approved May 13, 1905, and in force July 1, 1905. (Sec. 7, Chapter 70, Cahill's Illinois Revised Statutes, 1929.)"

The second count contained similar allegations. The particular charge is that defendant "negligently and carelessly failed and omitted to erect a guard, rail, sign or any other warning of said projecting water pipe in said street, or at said place, although defendant knew, or by the exercise of ordinary care and caution on its part could have known, of the condition aforesaid, and which condition defendant knowingly suffered and permitted to exist for a long period of time, to-wit, for one year before said date."

On October 25, 1932, prior to the trial, plaintiff obtained leave to file and filed an additional count, to which on the same day defendant filed two pleas, substantially the same as those filed to the original counts. In the additional count it is averred that defendant, a municipal corporation, "owned, controlled, managed and operated the water works of said city (supplying water to the inhabitants thereof) and the pumping stations, water mains, pipes, shut off or 'buffalo' boxes, shut off valves and other apparatus used in the operation and control of said water works and water supply"; that on January 11, 1930, defendant "owned, controlled, managed and operated a certain water control box, or shut-off box, or 'buffalo' box, or pipe projecting out of the ground on the parkway between the curbing and the sidewalk, at or near the southwest corner of Washington boulevard and Laramie street"; that defendant "then and there so negligently constructed and maintained said water pipe, shut-off box, 'buffalo' box or shut-off valve, that it then and there projected above the ground level to such an extent as to be dangerous to persons walking over or across said street"; that plaintiff, while exercising ordinary care

for her own safety, "stepped from the sidewalk across said parkway to a point at or near the curbing of said street, intending to enter . . . a motor bus, and, while so crossing the parkway or ground between said sidewalk and curbing, her foot struck against or caught in the top of said water pipe, 'buffalo' box, control box or valve box, which was then and there entirely or partially covered with snow, and plaintiff was thrown with great violence to and upon the ground"; and that in consequence thereof she was seriously and permanently injured, etc. The service of notice upon the officials of defendant, as set forth in the first count, is also averred, and the notice, as served and receipted for, is set out in full.

On the trial plaintiff testified in her own behalf at considerable length, both on direct and cross-examination, stating in great detail how the accident happened, the circumstances leading up to it and her injuries resulting therefrom. No other witness to the accident was called by either party, and her testimony relating thereto stands uncontradicted on the record. She also called seven other witnesses. Two of them were physicians,—Dr. Salvatore Mirabella (her attending physician, who treated her for a long period of time after the accident at a hospital and at her home), and Dr. Peter Cutrera (a physician and surgeon and X-ray expert). Three other witnesses for her were John Pavelka (janitor of an apartment building at said southwest corner); Richard L. Kelly (an employee of defendant and the keeper of its records of the location of water mains and other pipes in the streets and of the "shut-off" boxes near the curbs of streets); and Ferdinand Petraitis (who testified as to certain measurements made at said corner about one month before the trial, and as to the location of three "shut-off" boxes). Salvatore Caruso (father of plaintiff) and Jessie Caruso (sister-in-law of plaintiff) were the

other witnesses called in her behalf. Plaintiff also offered in evidence various writings, consisting of medical and hospital bills and the notice to defendant of July 8, 1930; also a plat of said corner and certain X-ray pictures. Defendant called only two witnesses, John J. Moudry (a map draftsman in its employ) and Dr. Martin Schupmann, a physician and surgeon, who testified as a medical expert. Defendant also offered in evidence certified copies of certain ordinances of the City of Chicago and of the West Chicago Park Commissioners, and a photograph and a plat of the place of the accident. At the close of plaintiff's evidence, and again at the close of all the evidence, defendant moved for a directed verdict in its favor, but the motions severally were denied.

Plaintiff's witness, Kelly, as to the records of defendant and the plat of said corner, etc., testified in part:

"We have no record of parkways. The City merely recognizes the street from lot line to lot line. There is a 'buffalo box' at that corner. This plat shows it correctly. There are *four* 'buffalo' boxes on the south side of Washington Boulevard in front of the first four lots. The first *three* boxes near Laramie *were put in by the City*. The next, or fourth box, was a private contract job. This is the one that is farthest west from Laramie. It is 76 feet from the west side of Laramie. The third box is *53 feet* away from Laramie, and the second box is *46 feet* away. The one nearest the corner is *12 feet* away. . . . This first box, which is 12 feet away from Laramie, as well as the second and third boxes, were all put in on April 1, 1908. The fourth box, 76 feet away and constructed under private contract, was put in on June 8, 1904. As far as I know, *all* of these boxes *have remained there ever since their construction*. Ordinarily, the City *takes care of the matter of maintenance*. . . . Very often the City will,

on request of a consumer, bring a 'buffalo' box up to grade, if it is buried. In case of a leak . . . not apparent on the surface, *the City* goes around and *digs up the box.* The 'shut off' box is merely where you put the key down to shut the water off. That is all the City has to do with it. . . . A 'buffalo,' or 'shut off' box is a hollow one that goes down to the pipe that runs from the water main into the house or property. You put a rod down into the key of the valve to shut the water off, so that it doesn't get into the building. The actual valve is about 4½ feet below the surface.''

From the testimony of some of plaintiff's witnesses, and from the photograph introduced by defendant, it appears that there was an apartment building on said corner, fronting north on Washington boulevard and having two entrances, the first being about 25 feet west of Laramie street. Immediately north of the building was the south sidewalk of the boulevard, running east and west. North of the sidewalk and between it and the curb was a grass parkway, having a tree or trees in it, and also the four ''buffalo'' boxes. Between the sidewalk and the curb, and about 25 feet west of Laramie street, was a narrow strip of concrete walk, running north and south. West of this was another similar narrow strip of walk, running from the sidewalk to the curb. Immediately west of the most westerly of the narrow strips of walk was a pole, on the top of which was a large sign with the words: ''No parking from here to corner. West Chicago Park Com'rs.'' Adjoining the curb, parallel with it, and running west for a considerable distance from Laramie street, was another narrow strip or platform of concrete walk. Apparently it was put there for the convenience of persons boarding or alighting from busses and other vehicles.

As to the accident and subsequent happenings plaintiff testified on direct examination in part as follows:

"I reside at No. 840 North Laramie street. I lived there with my parents in January, 1930. I then worked for a business concern as an assistant bookkeeper. On Saturday, January 11, 1930, after completing my work for the day I went home. I had an appointment to go to a dance and the theatre with friends in the evening. I left home about 7:45 p. m. No one was with me. I took a bus and went south on Laramie, alighted at Washington Boulevard, and crossed over to the southwest corner for the purpose of taking another bus going east. No bus was coming and, as it was cold, I went into the doorway of the apartment building on the southwest corner. Quite a number of people were waiting for the east-bound bus. In about 10 minutes I saw a bus coming and I hurried out of the doorway and towards the bus. Because of other vehicles in the way the bus stopped several feet back of the bus sign. My toe caught in this 'buffalo' box, which was partly covered with snow. I didn't see it. I didn't know it was there. I was thrown sort of forward and I fell. My knee hit the box. Two young men picked me up and helped me into the bus. I had much pain in my left knee. Afterwards I got off the bus at Canal street and met a friend at the Northwestern depot. We took a train there and got off at Wilson avenue, met other friends, and decided to go to the theatre. I left in the middle of the picture, as my knee was in great pain. I took a taxi home. . . . I rested over Sunday. The knee didn't pain me as much. Monday I went to work again and worked that one week. Then our family physician, Dr. Mirabella, was called. He told me to stay in bed, gave me some medicine and some salve to rub on the knee, which did not improve, and afterwards the doctor took me to a hospital and put a cast on the leg. . . . My knee wasn't cut, but it started to swell about two weeks after the accident. . . . The first cast was kept on about a month. It extended from

the knee to the ankle. It did not relieve the pain, and was taken off and X-rays of the knee and leg were taken. Then a second cast, made of plaster of paris, was put on from my waist down. I was unable to move my body at any point covered by the cast. The same doctor, Dr. Mirabella, attended me at the hospital. I remained there 5½ months. I had much pain in the knee. . . . After the 5½ months had elapsed my condition was so improved that I was taken home in an ambulance, but with the same cast still on. The pain had lessened. I stayed in bed 11 months altogether, in the hospital and at home, when the cast was removed. I was then able to sit up in bed, and while my knee felt much better, there was a swelling in the leg. . . . When the cast was removed my knee was stiff and I couldn't walk. Afterwards I started walking on crutches for about 3 months at home, but I wasn't able to walk up or down stairs or to go outdoors. . . . Later I was able to walk outdoors, but not alone, because of stiffness of the knee. Later the knee improved and the swelling went down but not entirely. The left knee is now about an inch larger than the other knee. If I sit on a chair or otherwise my leg goes up. I can't bend my knee at all. If I stand on the leg for a considerable time it swells and then the swelling subsides. Before the accident I was very active on my feet and was very fond of dancing, which I did a great deal. Before the accident I never had any disability of my left leg. (The leg and knee were shown to the jury.) . . . At the time of the accident I earned $22.50 a week. I have done no work since for a salary . . . I did not examine the pipe or box in the parkway, against which I stumbled, until about one week ago.''

At the conclusion of the above testimony the court adjourned until the following morning. When the trial was resumed plaintiff's attorney was given leave to ask plaintiff a few more questions and in response

to them she further testified on direct examination in part as follows:

"I had never before gone to the entrance of the apartment building to wait for a bus. I had never before crossed the parkway to take a bus. . . . About 10 or 12 other people were waiting for the bus on that night. . . . They were standing on the strip and moved west like I did. When my toe caught this box it scraped some of the snow off of it and I noticed how I tripped. . . . *The box stood several inches above ground.* It was *about a foot from the platform* that people used to get on busses, and *about 6 to 7 feet from the cement walk* leading from the apartment building to the curb."

During the lengthy cross-examination of plaintiff she further testified in part as follows:

"I left the vestibule of the apartment building when the bus was still about a block away. . . . I went to a sort of platform where the others were waiting. The bus came to a complete stop before I started for it. I was sort of surrounded by other people. I hurried like they all did because the bus had stopped further back than where it should have stopped. All the people were hurrying, all walking faster than usual. The bus had stopped about 8 feet or so from the curb and we had to step off the curb and walk in the street to get it. . . . I looked where I was going but was hurrying faster than usual. My foot caught on the 'shut-off' box and then I fell. I didn't know what I had fallen on until I had gotten up and looked at it. . . . I noticed that the pipe I fell on was *3 or 4 inches above the surface.* . . . *The snow was about 4 inches on the ground.* This projection was *partially concealed.* . . . It was so dark I couldn't see anything. I didn't look to see what was there. All I did was to try to get onto the bus and I was hurrying. . . . The bus remained standing until I got on it.

I sort of limped. Two gentlemen assisted me onto the bus.''

On a subsequent day of the trial, and after plaintiff had rested her case in chief, she was recalled to the stand, and over the objection of defendant, was allowed to give further testimony in part as follows:

''At my attorney's request, I went to the scene of the accident this morning and took some measurements. I *now find* that there are *two* cement strips of walk from the sidewalk to the curb. The first strip of walk is about 25 feet west of Laramie street, and the next one is about 20 feet still further west. After I left the apartment building that evening, in walking towards the curb, I took the most westerly of the two strips of walk. This morning I located the 'buffalo' box over which I tripped, and I took measurements of its distance from the building line of Laramie street. That distance is *53 feet*.''

The main contention of counsel for defendant is in substance that the trial court erred in not granting defendant's motion, made at the close of all the evidence, for a directed verdict in its favor, because it was not under any legal liability to respond in damages for plaintiff's injuries occasioned by her stumbling against and falling upon the water pipe or water box in the parkway in Washington boulevard on the evening in question. It is first argued that it appears from the ordinances introduced in evidence, passed by defendant and the West Chicago Park Commissioners, that defendant did not at the time of the accident or for years prior thereto have the control, management or supervision of the particular portion of the street, or the particular parkway in question, but that the same was under the control, management and supervision of said West Chicago Park Commissioners. After reading the ordinances, and considering the testimony of plaintiff's witness, Kelly, above set forth, we are

of the opinion that there is no merit in the argument. In one of the ordinances of defendant it is specifically provided that "this ordinance shall not be a waiver by the City of Chicago of any right or power it now has or hereafter may have in relation to laying water pipes . . . in said streets, and the *regulating, repairing and operating* of the same, but all such rights and powers *are hereby reserved* to said City of Chicago."

Counsel also argue in substance that even if defendant did have the control and supervision of the particular water pipe or shut-off box in the parkway on the evening in question, it owed no duty to a pedestrian traveling over the sidewalk, parkway and street, to exercise care to see that the pipe or box was not such an obstruction as was liable to injure such pedestrian, crossing the parkway in the exercise of ordinary care, and that the evidence did not sufficiently disclose that defendant was guilty of any actionable negligence. In view of the undisputed evidence in this case and the decisions and holdings of courts of review in this State, as well as the general current of authority in other jurisdictions in this country, we find no merit in the argument. A leading and applicable case in this State is *Brennan v. City of Streator*, 256 Ill. 468. In that case the plaintiff recovered a judgment for damages for personal injuries against the city, which the Appellate Court affirmed, and which on certiorari the Supreme Court affirmed. From the opinion it appears that the plaintiff's injuries, received on an evening in July, 1906, were occasioned by her stumbling over an obstruction in the street, charged to have been negligently permitted to remain there by the city; that while plaintiff was walking north on the east side of the street on which she lived and upon a brick sidewalk, she attempted to pass four women, who were walking abreast ahead of her and occupying the whole

sidewalk; that in order to pass them she had to step off the sidewalk at its outer edge, and as she did so her foot struck a valve-box attached to a water service pipe, which projected four or five inches above the ground within one to three inches of the edge of the sidewalk; that she was thrown to the ground and received the injuries complained of; that between the sidewalk and the curb was a space, about 10 feet wide, which was smooth and on a level with the sidewalk; that the time was after dark and there was no artificial light; that the valve-box was an iron pipe, 3½ inches in diameter, coming up from the water service-pipe laid in the ground, extending above the surface and terminating in a cap five inches in diameter; that its object was to control the admission of water to the adjoining premises; and that it had been where it was probably since the water pipe was laid four years before July, 1906. In affirming the judgment our Supreme Court in its opinion said (pp. 471, 472, italics ours):

"The court refused to give an instruction to the jury to find for the defendant, and it is insisted here that the evidence shows no failure of duty on the part of the city; that having furnished a safe sidewalk it is not liable to one who voluntarily leaves it. A municipal corporation is not under the obligation to keep its streets absolutely safe for persons passing over any part of them. Its duty is only to exercise ordinary care to keep its streets and sidewalks reasonably safe for persons using them who are themselves exercising ordinary care. Not all parts of all streets are needed for public passage, and it is customary and lawful for cities to improve certain parts of the streets for the use of vehicles, certain parts for foot passengers, and to permit other parts of some streets not required for these uses to be occupied by trees, hitching posts, hy-

drants, flower beds, stepping stones, poles for telephone or telegraph wires, or wires for the transmission of electricity for light or power. Such obstructions do not constitute a violation of the duty of the city toward the public *if the street still remains reasonably safe for those using it in vehicles or on foot and exercising ordinary care.* But the question arises in each case whether the obstruction is of such a character that the passenger using the street or the sidewalk in the ordinary way and using ordinary care for his own safety is exposed to *an unnecessary and unreasonable risk. This is usually a question of fact,* but it may become a question of law where the obstruction is of such a character that reasonable minds cannot differ about it. *The present is not such a case.* It cannot be said, as a matter of law, to show a want of ordinary care for a person desiring to pass a party of walkers taking up the whole walk to step on the sod a few inches to one side of the brick or stone or concrete sidewalk. It is not an unusual thing, *and what is not unusual is to be anticipated.* It is negligence for one whose duty is to use reasonable care to make conditions safe, to provide conditions *which are unsafe under circumstances which ought to be anticipated.* At least it was a question of fact which was proper for submission to the jury whether the valve-box, constructed and located as it was with reference to the sidewalk, was so dangerous a menace to persons using the sidewalk with ordinary care as showed a want of ordinary care for their safety on the part of the city in permitting it to remain there.''

See, also, the cases of *Pennington v. Rowley Bros. Co.,* 241 Ill. App. 58, 67, and *Butler v. City of McMinnville,* 126 Ore. 56, 63, 64. In the *Butler* case it is said: ''A city has no right to maintain anything in the nature of a pitfall, trap, snare or like obstruction, where-

by the traveler, yielding to the impulse of the average person to cut across a corner in a hurry, may be injured, nor will it be permitted to allow others to do so. Summarizing, we cannot say it is negligence *per se* for the plaintiff to have crossed this strip at a point other than where the usual or designated passageways were provided. Whether the plaintiff exercised due care was, under the clear and accurate instructions of the trial court, a question of fact for the jury to determine.'' The *Butler* case is also reported in 59 A. L. R., p. 381, and following it is a lengthy annotation, commencing at page 387, headed ''Liability for injury on park strip between sidewalk and curb.'' And it is stated in the annotation: ''Upon the principle that park strips between the sidewalks and curbing of a street are as much a part of the street as any other ground within its limits, liability on the part of the municipality, other conditions constituting negligence found to exist, has been sustained or recognized in the following cases:'' (Here follow the citations of numerous adjudicated cases.) And at page 389, under the heading ''Duty to Pedestrians,'' it is stated: ''While the municipality is not required to keep all the space along the sidewalk in the same condition for use as the sidewalk proper, it is under the duty to take cognizance of the fact that pedestrians sometimes walk over a park space, and must exercise due care to have such area in a reasonably safe condition.'' Numerous citations of cases in support of this statement follow on succeeding pages. Among the many cases decided in jurisdictions outside of Illinois, which hold in substance, under somewhat similar facts to those in the present case, that the questions of the negligence of the municipality and the contributory negligence of the injured party are for the jury to determine, are: *Corcoran v. City of New Haven,* 108 Conn. 63, 67, 68; *Fockler v. Kansas City,* 94 Mo. App. 464, 468, 469;

*Coffey v. City of Carthage,* 186 Mo. 573, 582, 583, 200 Mo. 616, 627; *Lund v. City of Seattle,* 99 Wash. 300, 303; *McDonald v. City of St. Paul,* 82 Minn. 308, 316; *Corbin v. City of Huntington,* 81 W. Va. 154, 156, 158.

Counsel for defendant also contend that the jury's verdict on the questions of defendant's negligence and plaintiff's contributory negligence is against the manifest weight of the evidence. We have carefully considered plaintiff's testimony in its entirety, as well as the other evidence bearing on these questions, and we are unable to agree with the contention.

Counsel further contend that plaintiff "failed to prove the filing of the statutory notice of the accident and injuries and the doctor's name and address" with the officials of the city. We find no substantial merit in the contention. The original notice of July 8, 1930, as set forth in the declaration, was offered in evidence by plaintiff and was ordered by the court to be marked as an exhibit, and it appears as such in the present record. When it was offered defendant's attorney objected to its admission, but admitted that "the notice was served." And he stated that the objection only concerned its "contents"; and, upon his request, the court reserved a ruling upon its admission until those objections should be made. Defendant's attorney never thereafter made any objections to it, and apparently, through inadvertence, the court did not thereafter formally order its admission in evidence. In view of these circumstances and said attorney's admission, and the fact that the notice, as drafted and served upon the officials of the city, apparently complied with all the essential requirements of the statute (par. 7, ch. 70, Cahill's Stat. 1929, p. 1473), we do not think that defendant is in any position to claim reversible error because the court did not formally allow the admission in evidence of the notice. (See *McComb*

*v. City of Chicago,* 263 Ill. 510, 512, 513; *Graham v. City of Chicago,* 346 Ill. 638, 644, 645.)

Counsel further contend that the court committed reversible error in the admission of certain testimony of plaintiff's expert witness, Dr. Cutrera, upon the ground that he was not sufficiently qualified to express certain opinions that he did express. After reviewing his entire testimony and other admitted evidence we find no merit in the contention. (See *Kimbrough v. Chicago City Ry. Co.,* 272 Ill. 71, 78; *City of Chicago v. Didier,* 227 Ill. 571, 575.) Furthermore, some of the opinions expressed by the witness were the same in principle and substance as those expressed by defendant's expert witness, Dr. Schupmann.

Complaints are made of the giving of certain instructions offered by plaintiff and in the refusal to give certain other instructions offered by defendant. We have examined these instructions in connection with all the given instructions and do not think that the court committed any reversible error in any of the rulings complained of. We think that the jury were fully and fairly instructed.

And we are unable to say, in view of the evidence as to the extent and permanency of plaintiff's injuries, that the jury's verdict of $6,000 is excessive.

For the reasons indicated the judgment of the superior court of February 10, 1933, against the defendant, City of Chicago, is affirmed.

*Affirmed.*

Scanlan and Sullivan, JJ., concur.